IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| JAMON VASHAWN HARRIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:14cv090 (REP) |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

James Vashawn Harris ("Plaintiff") is thirty-four years old and previously worked in laundry service. On February 9, 2010, Plaintiff filed for Supplemental Security Income ("SSI") under the Social Security Act ("Act"), alleging disability from a herniated disc, leg and hip pain, and asthma, with an alleged onset date of December 1, 2009. Plaintiff's claim was denied both initially and upon reconsideration. An Administrative Law Judge ("ALJ") held a hearing on September 9, 2011, and a supplemental hearing on March 21, 2012. The ALJ subsequently issued a written decision denying Plaintiff's request for benefits on April 13, 2012. On March 15, 2013, the Appeals Council granted Plaintiff's request for review, vacated the ALJ's April 13, 2012 written decision, and remanded the case to another ALJ for further review. On July 30, 2013, Plaintiff (represented by counsel) and a vocational expert ("VE") testified during a hearing before the ALJ. On August 9, 2013, the ALJ again found that Plaintiff was not disabled under the Act. The Appeals Council denied Plaintiff's request for review on December 16, 2013, rendering the ALJ's decision the final decision of the Commissioner.

Plaintiff seeks judicial review of the ALJ's August 9, 2013 decision in this Court pursuant to 42 U.S.C. § 405(g). Plaintiff challenges the ALJ's denial of benefits on the basis that the ALJ erred in finding that Plaintiff's condition failed to meet listing § 1.04A, in assessing Plaintiff's credibility and in determining Plaintiff's residual functional capacity ("RFC"). (Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 11) at 9-16.) Defendant argues that substantial evidence supports the ALJ's decision. (Def.'s Mot. for Summ. J. & Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 13) at 20-29.)

This matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment.[1] For the reasons set forth below, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 11) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 13) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.    BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history, medical records, state agency physician's opinion, Plaintiff's function report, Plaintiff's testimony and VE testimony are summarized below.

A.  Education and Work History

Plaintiff attended school through the eleventh grade. (R. at 47-48, 316.) Plaintiff previously worked as a laundry production worker and as a store clerk. (R. at 317.)

---

[1]    The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

B. Medical Records

On November 4, 2009, Plaintiff went to Retreat Doctors' Hospital, complaining of lower

back pain with radiation to his right leg, foot pain, hip and pelvis pain, and numbness in his

chest. (R. at 382-94.) Plaintiff's musculoskeletal and neurological examinations were normal.

(R. at 387.) Plaintiff exhibited no focal weakness or focal sensory loss in his extremities. (R. at

387.) Plaintiff's gait remained normal. (R. at 387.) Plaintiff underwent x-ray examinations for

his right hip and lumbar spine. (R. at 430-31.) Craig D. McCormick, M.D. reviewed Plaintiff's

x-rays and determined that no definitive evidence of an acute displaced fracture existed. (R. at

430-31.) Plaintiff's condition was stable and he was discharged that same day. (R. at 387-89.)

On November 12, 2009, Plaintiff saw Harold T. Green, Jr., M.D., complaining of low

back pain, leg pain and tingling in his legs and foot. (R. at 412-13.) Plaintiff exhibited no motor

or sensory loss during the physical examination. (R. at 413.) Dr. Green noted tenderness at L4-

L5-S1 with paraspinal spasms and decreased range of motion on flexion, extension or lateral

rotation. (R. at 413.) Dr. Green diagnosed Plaintiff with degenerative disc disease and ordered

an MRI of his lumbosacral spine. (R. at 413.) On November 25, 2009, Dr. Green ordered a CT

scan of Plaintiff's lumbar spine. (R. at 419.) Dr. Green found that Plaintiff suffered disc

herniations with thecal sac compression at L3-L4, L4-L5 and L5-S1. (R. at 419.)

On January 8, 2010, Plaintiff returned to Dr. Green, complaining of severe pain in his

lower back and difficulty working because of the pain. (R. at 410.) Dr. Green noted tenderness

at L4-L-L5-S1 with paraspinal spasms and decreased range of motion on flexion, extension or

lateral rotation. (R. at 410.) Dr. Green also observed that Plaintiff exhibited no motor or sensory

loss. (R. at 410.) Dr. Green conducted a straight-leg raise test and a heel and toe raise test that

were both negative. (R. at 410.) Dr. Green diagnosed Plaintiff with a herniated nucleus

3

pulposus (slipped disc) and degenerative disc disease. (R. at 410.) Dr. Green referred Plaintiff for a neurosurgical appointment. (R. at 410.)

On January 26, 2010, Anne H. Tapscott, N.P. completed Plaintiff's neurosurgery initial intake report. (R. at 440.) Ms. Tapscott reviewed Plaintiff's lumbar CT scan and informed Plaintiff that he suffered from degeneration in the disks at L5-S1 and L4-5 with some canal stenosis at L3-4 due to the broad based disk and ligamentum hypertrophy. (R. at 442.) Plaintiff's images also showed a right herniated disk at L4-5, causing canal stenosis and a right paracentral disk protrusion at L5-S1. (R. at 442.) Ms. Tapscott observed that Plaintiff looked comfortable throughout the appointment and "much better" than his images suggested. (R. at 442.) Ms. Tapscott also noted that Plaintiff demonstrated mild radicular symptoms. (R. at 442.)

On February 25, 2010, Plaintiff underwent an MRI of the lumbar spine that showed severe degenerative changes and disc herniation at L3-4, L4-5 and L5-S1. (R. at 443-44.) On March 2, 2010, Plaintiff saw Scott Graham, M.D. in the Medical College of Virginia ("MCV") Department of Neurosurgery. (R. at 438-39.) Plaintiff discussed his right leg pain that radiated from his lower back into his right leg and the top of his foot. (R. at 438.) Plaintiff noted that his pain was severe and prevented him from working. (R. at 438.) Dr. Graham conducted a physical examination and observed that Plaintiff demonstrated anterior and extensor halluces longus ("EHL") strength of 5/5. (R. at 438.) Plaintiff walked with a normal gait and had intact sensation to light touch. (R. at 438.) Dr. Graham reviewed Plaintiff's MRI and found that Plaintiff had diffuse degenerative disk disease at L3-4, L4-5 and L5-S1, disk herniation primarily on the right side at L4-5 and a smaller disk herniation on the right at L5-S1 that displaced the S1 nerve root. (R. at 438.) Dr. Graham prescribed pain medication and explained treatment options to Plaintiff, including a right L4-5 discectomy to relieve Plaintiff's back and leg pain, a

4

microdiscectomy and long-term management. (R. at 439.) Dr. Graham performed Plaintiff's L4-L5 discectomy on March 22, 2010. (R. at 439, 466.)

On March 25, 2010, Dr. Green examined Plaintiff following his surgery. (R. at 466.) Plaintiff complained of severe pain is his right lower back and right hip, but stated that the pain in his right leg had improved. (R. at 466.) On examination, Dr. Green found no sensory or motor deficits. (R. at 466.) Dr. Green encouraged Plaintiff to take previously prescribed medication as instructed and to engage in a regular exercise plan, for twenty to sixty minutes, three to five times per week. (R. at 466.)

On June 22, 2010, Plaintiff saw Dr. Graham for a post-operation follow-up. (R. at 578-79.) Plaintiff complained of right back, right hip and leg pain. (R. at 578.) Plaintiff indicated that his right leg pain had improved initially following surgery, but stated that the pain had returned over the previous several weeks. (R. at 578.) Plaintiff stated that he did not enroll in the prescribed physical therapy program, because he had difficulties scheduling his appointments. (R. at 578.) Dr. Graham conducted a physical examination that showed that Plaintiff's knee reflexes were intact bilaterally, but his right Achilles reflex was diminished. (R. at 578.) Plaintiff exhibited some weakness in his right extensor toe and his straight-leg raise test was positive on the right at approximately forty-five degrees. (R. at 578.) Dr. Graham prescribed hydrocodone to relieve Plaintiff's pain and ordered a new lumbar MRI. (R. at 578-79.) On July 20, 2010, Plaintiff's MRI revealed enhanced scarring around the residual disc material along the posterior vertebral surface, flattening of the thecal sac and right perineural enhancement and disc bulging at L3-L4 and L5-S1. (R. at 591.) The MRI also showed that the left S1 nerve root abutted the bulging disc and that post-surgical changes were consistent with the right L4 hemilaminectomy. (R. at 591.) Dr. Graham observed that Plaintiff's prior disc

5

herniation looked good on the scan, but reported diffuse degenerative changes and a congenitally narrow spinal canal. (R. at 576.) Dr. Graham noted that Plaintiff experienced improvement over the previous six weeks. (R. at 576.) Dr. Graham recommended that Plaintiff continue with conservative treatment and wrote a new prescription for Plaintiff to attend physical therapy. (R. at 576.)

On August 21, 2010, Plaintiff went to the emergency room at MCV, complaining of severe radiating lumbar pain. (R. at 492.) Plaintiff stated that movement, bending over, walking and changing position while lying down exacerbated his pain. (R. at 492.) Plaintiff experienced the same symptoms on his right side before his L4-L5 hemilaminectomy/discectomy. (R. at 492.) Plaintiff exhibited normal sensory and motor functions, but walked with an antalgic gait. (R. at 494.) Plaintiff exhibited mild tenderness to palpation in his left lower back lateral to the spine and no point tenderness in his lumbar or sacral spine. (R. at 494.) Deformity, ecchymosis and edema were not detected. (R. at 494.) Plaintiff could raise both legs to approximately ninety degrees while lying supine, but he experienced pain in his posterial left leg. (R. at 494.) Plaintiff exhibited no focal neurological deficits, and his symptoms were consistent with discogenic pain from his known herniated discs. (R. at 495.)

Kirk L. Cumpston, D.O. reviewed and amended Plaintiff's August 21, 2010 treatment notes later that day. (R. at 496.) Dr. Cumpston noted that he was not present with the resident, physician's assistant and nurse practitioner during Plaintiff's initial interview and examination. (R. at 496.) Dr. Cumpston personally interviewed Plaintiff and repeated the critical portions of the examination. (R. at 496.) Dr. Cumpston reported that Plaintiff complained of left lower back pain with intermittent numbness in his foot and had a history of right hemilaminectomy secondary to arthritis. (R. at 496.) He noted that Plaintiff had received a steroid prescription and

6

analgesics the previous day for his symptoms. (R. at 496.) Dr. Cumpston found that Plaintiff demonstrated tenderness in his left paraspinal muscles and that Plaintiff's neurological examination was grossly intact. (R. at 496.) Dr. Cumpston diagnosed Plaintiff with back pain and filled Plaintiff's prescriptions. (R. at 496.)

On October 26, 2010, Plaintiff followed-up with Dr. Graham, complaining of severe lower back pain and left leg pain. (R. at 574.) Dr. Graham reviewed Plaintiff's MRIs taken in the summer of 2010 and found extensive degenerative changes. (R. at 574.) Dr. Graham recommended a L3-S1 fusion with posterior lumbar interbody arthrodesis at three levels. (R. at 574.) On November 23, 2010, Susan S. Vaughan, N.P. completed Plaintiff's neurosurgery admission history and physical. (R. at 515-17.) Plaintiff noted that Dr. Graham performed Plaintiff's discectomy in March 2010, and that it helped relieve Plaintiff's pain for some time. (R. at 515.) Plaintiff stated that he went to physical therapy and took two to three Percocets per day, but neither helped. (R. at 515.) Plaintiff complained of back pain across his lower back that worsened with standing and walking. (R. at 515.) Plaintiff's musculoskeletal examination showed that he retained normal range of motion, normal strength, no tenderness, swelling or deformity and walked with a normal gait. (R. at 516.) Plaintiff's sensation and motor function were normal and he showed no focal deficits, but Plaintiff's right leg reflexes were absent. (R. at 516.) Ms. Vaughan opined that Plaintiff suffered from lumbar degenerative disease and scheduled Dr. Graham to perform a lumbar fusion on December 1, 2010. (R. at 516.) Later that day, Theresa Pung Clor, N.P. completed Plaintiff's preoperative history and physical. (R. at 518-23.)

On December 1, 2010, Dr. Graham diagnosed Plaintiff with multilevel degenerative disc disease, lumbar stenosis and lipomatosis. (R. at 549.) Dr. Graham performed laminectomies at

L3, L4 and L5, posterior interbody arthrodesis at L3-4, L4-5 and L5-S1, pedicle screw instrumentation at L3, L4, L5 and S1, arthrodesis posterior lateral from L3 to S1 and durotomy repair. (R. at 549.) On January 11, 2011, Plaintiff visited Dr. Graham for his six-week post-operative visit. (R. at 884.) Dr. Graham ordered lumbar x-rays and found that the instrumentation remained intact and Plaintiff's alignment looked good. (R. at 884.) Plaintiff experienced some residual pain, but stated that he felt better. (R. at 884.) Dr. Graham prescribed pain medications and physical therapy for Plaintiff to increase his strength. (R. at 884.)

On March 22, 2011, Plaintiff underwent an MRI that showed straightening of his lumbar spine. (R. at 585.) The MRI revealed that Plaintiff's status post-laminectomy and posterior fusion of L3-S1 with discectomy of L3-L4, L4-L5 and L5-S1 with surgical bed fluid collection was most consistent with seroma and enhanced scar tissue. (R. at 585.) Plaintiff's MRI also showed an enhanced scar adjacent to the exiting L4-L5 nerve roots without definite evidence of thecal sac compression or significant nerve root impingement. (R. at 586.) The same day, Plaintiff complained to Dr. Graham about continued lower back pain that radiated to his buttocks and right leg. (R. at 570.) Plaintiff's straight-leg raise test results were negative for the right leg. (R. at 570.) Dr. Graham recommended conservative treatment, including increased walking, activity and physical therapy. (R. at 570.) Dr. Graham did not recommend additional surgery. (R. at 570.)

On May 11, 2011, Plaintiff saw Dr. Green, complaining of abdominal and lower back pain. (R. at 636.) Plaintiff explained that standing, sitting, walking, walking uphill and running were alleviating factors. (R. at 636.) Dr. Green observed that Plaintiff's reflexes, motor strength and gait were normal, and that Plaintiff's sensation remained grossly intact. (R. at 638.) On May 24, 2011, Plaintiff saw Dr. Graham and complained of right foot numbness, tingling in his

toes and intermittent numbness in his left hand. (R. at 568.) Dr. Graham reviewed Plaintiff's lumbar spine x-rays, which showed that Plaintiff's hardware remained intact, that there were no halos around the screws and the bony fusion began to form. (R. at 568.) Dr. Graham observed that Plaintiff's vertebral body heights were normal, no bony destructive lesions were evident and no interval change had occurred since Plaintiff's last examination. (R. at 870.)

On May 25, 2011, Plaintiff visited Durgada Basavaraj, M.D. with Neuro-Consultants, P.C. ("Neuro-Consultants"), complaining of severe back pain that worsened with stress, heavy lifting and driving. (R. at 848-50.) Plaintiff stated that he did not attend water aerobics classes as instructed, because he was not working. (R. at 848.) Dr. Basavaraj found that tilt movement and extension caused Plaintiff to suffer pain and tenderness in his lumbar paraspinal muscles. (R. at 848.) On examination, Plaintiff demonstrated normal range of motion in his left hip, knee and ankle joints without pain. (R. at 848.) He retained 5/5 muscle strength in all muscles tested and had normal knee and ankle jerk reflexes. (R. at 848.) Similarly, Plaintiff's right leg examination showed that he had 5/5 strength in all muscles without atrophy. (R. 858.) Plaintiff demonstrated normal sensation in his arms and legs in reaction to pin prick, fine touch and vibration. (R. at 848.) Dr. Basavaraj observed that Plaintiff's straight-leg raise test was normal on the left and that Plaintiff experienced pain at ninety degrees on the right. (R. at 848.)

On July 25, 2011, Plaintiff returned to Neuro-Consultants and saw Kanhaiyalal Trivedi, M.D., complaining of chronic lower back pain. (R. at 859.) Plaintiff stated that he had decreased his walking and standing by ten percent. (R. at 859.) Plaintiff once again stated that he did not attend water aerobics classes, because he did not work. (R. at 859.) On examination, Plaintiff experienced pain on flexion, tilt movement and extension. (R. at 859.) Dr. Trivedi found that Plaintiff retained 5/5 strength in all muscles tested. (R. at 859.) Plaintiff's

straight-leg raise test was normal on the left, but he experienced pain at ninety degrees on the right. (R. at 859-60.)  Plaintiff again reacted normally to pin prick, fine touch and vibration sensations in both his arms and legs. (R. at 860.)

On October 18, 2011, Plaintiff returned to Dr. Graham and discussed needing continued medication for his back pain. (R. at 867.)  Dr. Graham opined that Plaintiff's hardware remained intact and that the fusion healed well. (R. at 867.)  Dr. Graham also observed that Plaintiff had good motor strength, but demonstrated decreased reflexes. (R. at 867.)  Dr. Graham concluded that Plaintiff did not need further surgical intervention. (R. at 867.)

On November 15, 2011, Plaintiff visited Nancy Powell, M.D. with the Virginia Department of Rehabilitative Services, complaining of back pain, numbness in his right buttocks and asthma. (R. at 608-12.)  Plaintiff stated that he lived with his daughter and daughter's mother, and that he last worked in laundry service in 2009. (R. at 609.)  Plaintiff noted that he cooked and exercised by walking and completing physical therapy exercises. (R. at 609.)  He did not drive. (R. at 609.)  Dr. Powell observed that Plaintiff could walk from the waiting room to the examining room without difficulty and could sit, get on and off the examination table without assistance, could go from supine to sitting without any assistance and could take off and put on his own shoes. (R. at 610.)  Plaintiff demonstrated that he could execute a finger-to-nose test, could bring his right heel halfway to his left knee and could bring his left heel three-quarters of the way to his right knee. (R. at 611.)  Plaintiff walked with a normal gait and did not use any assistive devices. (R. at 611.)  Dr. Powell completed a range of motion examination and observed that Plaintiff's cervical spine, shoulders, elbows, wrists, hands, fingers, hips, knees and ankles remained within normal limits. (R. at 611.)  Plaintiff's straight-leg raise test was negative in the seated position. (R. at 611.)  Plaintiff exhibited no tenderness or edema and did not have

10

spasms, crepitus, cyanosis or clubbing. (R. at 611.) Plaintiff retained full motor strength in his arms and legs. (R. at 611.) Plaintiff reported decreased sensation to touch with a tingling feeling in his right buttock. (R. at 611.) Dr. Powell concluded that Plaintiff could walk or stand for six hours, but may require more frequent breaks due to back pain. (R. at 611.) Plaintiff could sit without restrictions, did not require assistive devices and could lift or carry thirty-five pounds occasionally and twenty-five pounds frequently. (R. at 611.) Dr. Powell determined that Plaintiff required possible postural limitations because of his back pain, but needed no manipulative or environmental limitations. (R. at 612.)

On November 16, 2011, Dr. Powell completed a Medical Source Statements of Ability To Do Work-Related Activities (Physical) form. (R. at 613-18.) Dr. Powell noted that Plaintiff could frequently lift or carry up to twenty pounds and could occasionally lift or carry twenty-one to fifty pounds. (R. at 613.) Dr. Powell also noted that Plaintiff could sit for four hours without interruption and could stand and walk for three hours without interruption. (R. at 614.) Dr. Powell concluded that Plaintiff did not require the use of a cane to ambulate, that he could frequently perform reaching, handling, fingering and feeling with both hands, Plaintiff could occasionally push or pull with both hands and Plaintiff could operate foot controls frequently. (R. at 614-15.) Plaintiff could frequently balance and could climb stairs and ramps, stoop, kneel, crouch and crawl occasionally, but he could never climb ladders or scaffolds. (R. at 616.) Dr. Powell noted that Plaintiff could be exposed to moving mechanical parts, humidity and wetness, dust, odors, fumes, pulmonary irritants, vibrations and loud noise frequently, be exposed to cold or extreme heat occasionally and could never be exposed to unprotected heights. (R. at 617.) Lastly, Dr. Powell determined that Plaintiff could shop, travel without a companion for assistance, ambulate without requiring a wheelchair, walker or canes, walk a block at a

reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single-hand rail, prepare a simple meal and feed himself, care for his personal hygiene and sort, handle or use papers and files. (R. at 618.)

On January 24, 2012, Dr. Green observed that Plaintiff did not have problems with his gait, retained a full range of motion in his back and exhibited no tenderness, palpable spasm or pain on motion. (R. at 679-80.) Dr. Green recommended that Plaintiff increase his physical activity, cease smoking and follow a low-fat diet. (R. at 681.) On February 21, 2012, Dr. Graham ordered an MRI of Plaintiff's lumbar spine that showed progressive thecal sac stenosis at L2-L3 related to more pronounced facet arthrosis and ligamentum flavum thickening at this level, with likely contribution from dorsal epidural scarring. (R. at 911-12.) The MRI indicated less fluid in the laminectomy defect compared to Plaintiff's previous imaging, and the scarring in the surgical defect remained mostly unchanged. (R. at 912.) Dr. Graham noted that Plaintiff showed a moderate degree of spinal stenosis. (R. at 917.) Dr. Graham discussed treatment options that required surgery. (R. at 917.) Plaintiff stated that he did not want to undergo more surgery. (R. at 917.) Dr. Graham also noted that Plaintiff's physical examination remained stable with good isolated motor strength and sensation. (R. at 917.)

On February 23, 2012, Dr. Green observed that Plaintiff had full range of motion in his back and did not exhibit tenderness, palpable spasm or pain on motion. (R. at 692.) Again, Dr. Green recommended that Plaintiff increase his physical activity, cease smoking and follow a low-fat diet. (R. at 693.) In May and June 2012, Dr. Green completed reviews of Plaintiff's systems and reported no myalgias, arthralgias, back pain, muscle weakness, joint pain or problems with gait. (R. at 703-04, 714.)

On August 31, 2012, Dr. Graham observed that Plaintiff suffered mild stenosis above the L3-S1 posterior lumbar interbody fusion, but that Plaintiff's MRI did not indicate that he required surgery. (R. at 935.)  Dr. Graham noted that Plaintiff's neurologic examinations were stable, he retained intact motor strength and sensation, and ambulated without difficulty. (R. at 935.)

On April 30, 2013, Plaintiff returned to Dr. Powell, complaining of back and hip pain and numbness in his hands. (R. at 624-27.) Dr. Powell observed that Plaintiff walked from the waiting room to the examining room without difficulty and could sit and get on and off the examining table without difficulty. (R. at 625.) Plaintiff could go from supine to sitting without assistance and could take off his shoes and put them back on. (R. at 625.) Plaintiff bent from the waist while seated to retrieve a pill bottle and walked the length of the block following his appointment. (R. at 625.) Dr. Powell noted that Plaintiff executed a finger-to-nose and heel-to-knee examination, had normal gait and wore an elastic back brace. (R. at 626.) Plaintiff's cervical spine, shoulders, elbows, wrists, hands, fingers, knees, hips and ankles were within normal limits. (R. at 626.) Plaintiff exhibited normal motor strength in his arms and legs. (R. at 626.) Plaintiff stated that he did not cook or do housework or yard work, but he did exercise by walking. (R. at 625.) Dr. Powell determined that Plaintiff could stand, walk or sit for six hours, that he could lift or carry thirty pounds occasionally and twenty pounds frequently. (R. at 627.) She opined that Plaintiff's ability to climb was possibly subject to postural limitations due to back pain, but that he had no manipulative or environmental limitations. (R. at 627.)

Dr. Powell completed a second Medical Source Statement of Ability to Do Work-Related Activities (Physical) on April 30, 2013. (R. at 628-33.) Dr. Powell concluded that Plaintiff could frequently lift or carry up to twenty pounds and could occasionally lift or carry twenty-one

to fifty pounds. (R. at 628.) Dr. Powell also noted that Plaintiff could sit for six hours without interruption, stand and walk for two hours without interruption, sit for a total of five hours in an eight-hour work day, stand for a total of two hours in an eight-hour workday and walk for a total of three hours in an eight-hour workday. (R. at 629.) Dr. Powell concluded that Plaintiff did not require the use of a cane to ambulate, could frequently perform reaching, handling, fingering and feeling with both hands, and could frequently push or pull with both hands and operate foot controls. (R. at 630.) Plaintiff could frequently balance, stoop, kneel and crouch, occasionally crawl and climb stairs and ramps, but never climb ladders or scaffolds. (R. at 631.) Dr. Powell noted that Plaintiff could frequently be exposed to moving mechanical parts, humidity, wetness, dust, odors, fumes, pulmonary irritants, vibrations and loud noise, and occasionally be exposed to extreme cold or heat, unprotected heights and operating a motor vehicle. (R. at 632.) Lastly, Dr. Powell determined that Plaintiff could shop, travel without a companion for assistance, ambulate without requiring a wheelchair, walker or canes, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single-hand rail, prepare a simple meal and feed himself, care for his personal hygiene and sort, handle or use papers and files. (R. at 633.)

C. State Agency Physician's Opinion

On August 10, 2010, John Sadler, M.D., a state agency physician, reviewed Plaintiff's medical records and completed a Disability Determination Explanation. (R. at 111-19.) Dr. Sadler determined that Plaintiff could perform light work. (R. at 117.) Dr. Sadler also found that Plaintiff could occasionally lift or carry approximately twenty pounds and frequently lift or carry ten pounds. (R. at 116.) Plaintiff could stand or walk for approximately six hours in an eight-hour workday and push or pull without limitation. (R. at 116.) Dr. Sadler also found that

14

Plaintiff could frequently kneel, crouch and balance, and occasionally stoop, crawl, climb ramps, stairs, ladders, ropes or scaffolds. (R. at 116-17.) Dr. Sadler determined that Plaintiff had no manipulative, visual, communicative or environmental limitations. (R. at 117.)

### D. Function Report

On February 21, 2010, Plaintiff completed a function report. (R. at 306-13.) He lived in an apartment with his family. (R. at 306.) His typical day entailed waking up, taking a bath, fixing food, getting dressed, going to a friend's house, playing video games or cards, eating and watching television until he fell asleep. (R. at 306.) Plaintiff indicated that his condition affected his sleep. (R. at 307.) Plaintiff had no problem using the toilet, feeding himself or shaving, but noted that bending or standing for too long irritated his back and leg. (R. at 307.) He needed no special reminders to take care of his personal needs or grooming or to take his medication. (R. at 308.)

Plaintiff prepared his own meals and could make sandwiches and frozen dinners daily. (R. at 308.) He washed dishes and emptied the trash. (R. at 308.) Plaintiff went outside every day. (R. at 309.) When he went out, he used public transportation or rode in a car. (R. at 309.) Although Plaintiff did not drive, he could go out alone. (R. at 309.) He could buy groceries at the store. (R. at 309.) Plaintiff could pay bills, count change, handle a savings account and use a checkbook or money order. (R. at 309.) Plaintiff's ability to handle money had not changed since the onset of his condition. (R. at 310.)

Plaintiff's hobbies included basketball, but he stated that he could no longer play due to pain in his back and right leg. (R. at 310.) Plaintiff reported that he spent time with others approximately three to four times per week. (R. at 310.) Plaintiff did not need reminders to go

15

places. (R. at 310.) When Plaintiff went out, he did not need someone to accompany him. (R. at 310.)

Plaintiff indicated that he did not have problems getting along with others. (R. at 311.) He got along well with authority figures, and had never been fired from a job because of problems getting along with others. (R. at 312.) Plaintiff noted that his social activities had not changed since his condition began. (R. at 311.) Plaintiff did not handle stress well. (R. at 312.) He could handle changes in routine sufficiently. (R. at 312.)

Plaintiff reported that he did not finish what he started. (R. at 311.) He followed both written and spoken instructions well. (R. at 311.) His condition affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs and complete tasks. (R. at 311.) Plaintiff could not lift much and could only walk about one block before his pain increased. (R. at 311.) Plaintiff could resume walking after approximately five to ten minutes of rest. (R. at 311.)

E. Plaintiff's Testimony

On July 31, 2013, Plaintiff (represented by counsel) testified at the hearing before the ALJ. (R. at 42-52.) Plaintiff was thirty-three years old and had worked in laundry service at MCV. (R. at 42, 44.) Plaintiff testified that he lived in a house with his cousin. (R. at 45.) Plaintiff stated that he had two children who visited him at home. (R. at 45.) Plaintiff went to bed very late and woke up between noon and 1:00 p.m. (R. at 45-46.) He spent most of his evenings on the sofa watching television. (R. at 46.) Plaintiff testified that he spent time with friends once or twice per week. (R. at 46.)

Plaintiff's doctor recommended that he attend physical therapy, stretch and walk every other day. (R. at 46.) Plaintiff testified that he usually showered instead of taking a bath. (R. at

16

46.) Plaintiff could get out of the bathtub by himself. (R. at 46-47.) He could make himself a sandwich and clean up after himself. (R. at 47.)

Plaintiff testified that he was five feet, seven inches tall and weighed 194 pounds. (R. at 47.) Plaintiff completed the eleventh grade. (R. at 47-48.) Plaintiff used to play basketball, but stopped because of his back and leg pain. (R. at 48.) Plaintiff testified that he could walk for about one and half blocks before needing to rest. (R. at 49.) He could lift approximately twenty pounds, but stated that doing so could strain his back. (R. at 49.) Plaintiff testified that he could sit for thirty to forty-five minutes before needing to stand up. (R. at 50.) When Plaintiff sat, it did not affect his ability to focus. (R. at 51.) Plaintiff further testified that he could stand for approximately fifteen minutes before needing to sit down. (R. at 51.) Typically, he would lie down for three to four hours per day. (R. at 51.)

F. Vocational Expert Testimony

During the July 31, 2013 hearing, a VE also testified. (R. at 53-58.) The ALJ asked the VE if a hypothetical person of the same age, education and work experience as Plaintiff, who could lift ten pounds frequently and twenty pounds occasionally, sit for six hours, stand and walk for six hours, could not negotiate ladders, ropes or scaffolding, could occasionally crawl, crouch, bend and stoop, required an option to sit or stand in place for two minutes twice each hour, needed to rest for ten minutes every two hours, was limited to simple, routine tasks and needed to miss eight days of work each year[2] could perform work in the national economy. (R. at 54.) The VE stated that such a person could perform work in the national economy. (R. at 54.) The VE explained that such an individual could work jobs at the light exertion level, including as a

---

[2]     The VE testified that an employer may tolerate up to twelve absences of work each year. (R. at 54.)

packer with 314,000 jobs nationally, as a title order caller with 397,600 jobs nationally, and as a router with 397,000 jobs nationally. (R. at 54-55.)

Next, the ALJ asked the VE whether, assuming everything in the first hypothetical, an individual who could not maintain time and attendance could perform work in the national economy. (R. at 55.) The VE explained that there would not be competitive employment for such an individual. (R. at 55.)

## II.   PROCEDURAL HISTORY

On February 9, 2010, Plaintiff filed for SSI due to his asthma, herniated disc, leg and hip pain with an alleged onset date of December 1, 2009. (R. at 262-68.) Plaintiff's claim was denied both initially and upon reconsideration. (R. at 111-20, 122-24.) Plaintiff appeared with counsel for a hearing before an ALJ on September 9, 2011, and again for a supplemental hearing on March 21, 2012. (R. at 60-67, 68-100.) On April 13, 2012, the ALJ denied benefits. (R. at 122-37.) On March 15, 2013, the Appeals Council granted Plaintiff's request for review, vacated the ALJ's April 13, 2012 decision and remanded the case to another ALJ for further review. (R. at 138-41.) On July 30, 2013, Plaintiff, represented by counsel, and a VE testified during a hearing before the ALJ. (R. at 34-59.) On August 9, 2013, the ALJ again denied benefits in a written decision. (R. at 9-11.) On December 16, 2013, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. 1-3.)

## III.   QUESTIONS PRESENTED

1.  Did the ALJ err in finding that Plaintiff's condition failed to meet listing § 1.04A?

2.  Did the ALJ err in assessing Plaintiff's credibility?

3.  Did the ALJ err in Plaintiff's RFC determination?

18

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla but less than a preponderance, and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)) (internal quotation marks omitted). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). Although the standard is high, if substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. § 416.920; *Mastro*, 270 F.3d at 177. An ALJ conducts the analysis for the Commissioner, and a court must examine that process on appeal to determine whether the ALJ applied the correct legal standards and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. § 416.920(b). SGA is work that is both substantial and gainful as defined by the Social Security Administration in the Code of Federal Regulations. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 416.972(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 416.972(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). To qualify as a severe impairment entitling one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 416.920(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) that lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. § 416.920(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to his past relevant work[3] based on an assessment of the claimant's RFC[4] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. § 416.920(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant can perform other work that is available in significant numbers in the national economy. 20 C.F.R. § 416.920(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. 20 C.F.R. § 416.960. When a VE is called to testify,

---

[3]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. § 416.965(a).

[4]     RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-80. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, eight hours a day, five days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. § 416.920(g)(1).

## V.   ANALYSIS

### A. The ALJ's Decision

On July 30, 2013, Plaintiff (represented by counsel) testified during a hearing before the ALJ. (R. at 34-52.) An impartial VE also testified during the hearing. (R. at 53-58.) On August 9, 2013, the ALJ issued a written opinion, determining that Plaintiff was not disabled under the Act. (R. at 9-11.) The ALJ followed the five-step sequential evaluation process as established by the Act when analyzing whether Plaintiff was disabled. (R. at 14-23.)

At step one, the ALJ determined that Plaintiff had not engaged in SGA since filing his application for SSI on January 14, 2010. (R. at 14.) At step two, the ALJ determined that Plaintiff had the severe impairments of degenerative disc disease of the lumbosacral spine status post-L4-5 discectomy in March 2010 and fusion in December 2010 and obesity. (R. at 15-16.) The ALJ further determined that Plaintiff's impairments or combination of impairments did not meet the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.) At step three, the ALJ determined that Plaintiff had the RFC to perform light work. (R. at 17-22.) Specifically, the ALJ determined that Plaintiff could lift ten pounds

frequently and twenty pounds occasionally, sit for six hours in an eight-hour day and stand or walk for six hours in an eight-hour day, could not negotiate ladders, ropes or scaffolding, but could occasionally crawl, crouch, bend and stoop. (R. at 17.) Further, Plaintiff must have a sit or stand option from which, while remaining in place, he could rise from a seated position or sit from a standing position for two minutes each hour, must rest for ten minutes every two hours, and would be limited to simple, routine tasks and would miss eight days of work per year. (R. at 17.) At step four, the ALJ found that Plaintiff had no past relevant work. (R. at 22.) Finally, at step five, the ALJ concluded that based upon Plaintiff's age, education, work experience and RFC, jobs existed in the national economy in significant numbers that Plaintiff could perform. (R. at 22-23.) Accordingly, the ALJ determined that Plaintiff was not disabled under the Act. (R. at 23.)

Plaintiff challenges the ALJ's decision on three grounds. First, Plaintiff argues that the ALJ erred in finding that Plaintiff's condition failed to meet listing § 1.04A. (Pl.'s Mem. at 9-11.) Second, Plaintiff contends that the ALJ erred in assessing Plaintiff's credibility. (Pl.'s Mem. at 11-14.) Third, Plaintiff asserts that the ALJ erred in determining Plaintiff's RFC. (Pl.'s Mem. at 14-16.) Defendant argues that substantial evidence supports the ALJ's decision with respect to each challenge. (Def.'s Mem. at 20-29.)

B. The ALJ did not err in determining that Plaintiff did not meet the requirements of listing § 1.04A.

Plaintiff argues that the ALJ erred in finding that Plaintiff's condition did not meet listing § 1.04A for a physical disability, because the ALJ failed to follow prescribed procedures to determine whether all of Plaintiff's impairments equaled a listed impairment. (Pl.'s Mem. at 9.) Defendant maintains that substantial evidence supports the ALJ's finding that Plaintiff did not medically equal § 1.04A. (Def.'s Mem. at 20.)

Plaintiff bears the burden of proving that he meets or equals a listing. *Yuckert*, 482 U.S. at 146 n.5. The listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and, consequently, require an exacting standard of proof. *Sullivan v. Zebley*, 493 U.S. 521, 532-33 (1990). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530.

To meet listing § 1.04A, Plaintiff's condition must satisfy all of the listing's enumerated criteria. *Zebley*, 493 U.S. at 530. Specifically, Plaintiff must demonstrate:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raise test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04A.

In this case, the ALJ found that Plaintiff had the severe impairments of degenerative disc disease in the lumbosacral spine and obesity. (R. at 15.) The ALJ found that Plaintiff's condition did not meet listing § 1.04A. (R. at 16-17.) The ALJ determined that obesity did not fall within the criteria of a listed impairment, but noted that it must be considered in conjunction with other related impairments. SSR 02-1p; (R. at 16). The ALJ also concluded that Plaintiff's obesity and degenerative disc disease of the lumbosacral spine had not resulted in evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness)

accompanied by sensory or reflex loss and, if there was involvement of the lower back, positive straight-leg raise test (both sitting and supine). (R. at 16-17.)[5]

Substantial evidence supports the ALJ's determination that Plaintiff did not meet listing § 1.04A on the basis that Plaintiff did not demonstrate motor loss (atrophy with associated muscle weakness or muscle weakness) and where there was involvement of the lower back, positive straight-leg raise test in both the seated and supine positions. On November 4, 2009, Plaintiff went to the emergency room at Retreat Hospital, where he demonstrated no focal weakness or focal sensory loss in his extremities. (R. at 387.) On November 12, 2009, Dr. Green determined that Plaintiff exhibited no sensory or motor loss. (R. at 412-13.) On March 2, 2010, Dr. Graham observed that Plaintiff's sensation remained intact to light touch. (R. at 438.) Dr. Graham also found that Plaintiff demonstrated anterior and EHL strength of 5/5. (R. at 438.) On March 25, 2010, Dr. Green completed a neurological examination and found that Plaintiff's cranial nerves remained intact and Plaintiff suffered no sensory or motor loss. (R. at 466.)

On August 21, 2010, Plaintiff went to the emergency room at MCV, where Plaintiff could raise both legs to approximately ninety degrees during the straight-leg raise test in the supine position. (R. at 494.) On May 25, 2011, Dr. Basavaraj observed that Plaintiff's straight-leg raise test results were normal on the left side and that Plaintiff could raise his right leg ninety degrees before experiencing pain. (R. at 848.) Dr. Basavaraj did not indicate whether he performed the straight-leg raise test in both the supine and sitting positions. (R. at 848-50.)

---

[5]     On August 6, 2012, Plaintiff's counsel wrote a letter to the Appeals Council regarding the interpretation of the language of § 1.04A. (R. at 17, 360-64.) Plaintiff's counsel wrote, "In other words, there must be 1) a medically determinable impairment; 2) proof that the medically determinable impairment results in impingement of a nerve root or spinal cord; and 3) physiological signs or symptoms expected to exist when a medically determinable impairment that impinges upon a nerve root or the spinal canal results in disabling low back pain." (R. at 17, 360-64.) The ALJ noted that this interpretation of the requirements to meet § 1.04A were over-inclusive. (R. at 17.)

Dr. Basavaraj also noted that Plaintiff had 5/5 strength in all muscles tested. (R. at 848.) On July 25, 2011, Dr. Trivedi examined Plaintiff and observed that his right leg had 5/5 strength in all muscles without atrophy. (R. at 859.) On November 16, 2011, Dr. Powell observed that Plaintiff's straight-leg raise test was negative in the sitting position. (R. at 611.) Dr. Powell also noted that Plaintiff's motor strength remained 5/5 in his arms and legs. (R. at 611.) On May 1, 2013, Dr. Powell again found that Plaintiff's straight-leg raise test results were negative and that Plaintiff exhibited normal motor strength in his arms and legs. (R. at 626.)

Significantly, on June 6, 2013, Dr. Green, Plaintiff's treating physician, completed a Medical Source Statement that specifically addressed Plaintiff's symptoms under § 1.04A. (R. at 761-66.) Dr. Green opined that Plaintiff had degenerative disc disease and herniated nucleus pulposus with additional symptoms of nerve root compression and limitation of motion of the spine. (R. at 761.) However, no evidence existed that Plaintiff suffered motor loss (atrophy with associated muscle weakness or muscle weakness), sensory or reflex loss or a positive straight-leg raise test in both the sitting and supine positions. (R. at 761-66.)

The ALJ also noted that Plaintiff's obesity and degenerative disc disease did not meet the requirements for spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness and resulting in the inability to ambulate effectively, as defined in § 1.00B2b to meet provisions B or C of listing § 1.04. (R. at 17.) Because the evidence relied upon by Plaintiff and considered by the ALJ does not demonstrate motor loss (atrophy with associated muscle weakness or muscle weakness), sensory or reflex loss or a positive straight-leg raise test in the sitting and supine positions, the ALJ did not err in finding that Plaintiff did not

26

have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in § 1.04A.

C. The ALJ did not err in assessing Plaintiff's credibility.

Plaintiff argues that the ALJ erred in diminishing Plaintiff's credibility on the basis that the ALJ applied an incorrect standard in making his credibility determination and solely used boilerplate language in his credibility explanation. (Pl.'s Mem. at 11-14.) Defendant counters that substantial evidence supports the ALJ's credibility determination. (Def.'s Mem. at 25-29.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. § 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or combination of impairments that reasonably could produce the individual's pain or other related symptoms. SSR 96-7p at 1-3. The ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p at 5 n.3; *see also* SSR 96-8p at 13 ("[The] RFC assessment must be based on all of the relevant medical evidence in the record."). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a determination of the credibility of the claimant's statements

27

regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent exceptional circumstances." *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)) (internal quotation marks omitted). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)) (internal quotation marks omitted).

Furthermore, Plaintiff's subjective allegations of pain do not alone provide conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). Instead, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

In this case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce some of the symptoms of the type alleged; however, Plaintiff's contentions as to the intensity, persistence and limiting effects were not credible in light of the record as a whole. (R. at 18.) The ALJ specifically diminished Plaintiff's credibility on the basis that his subjective complaints were unsupported by his treatment record. (R. at 18-22.) Substantial evidence supports the ALJ's determination.

Plaintiff's medical records support the ALJ's determination of Plaintiff's credibility. On March 2, 2010, Dr. Graham completed a physical examination during which Plaintiff demonstrated anterior and EHL strength of 5/5, walked with a normal gait and had intact sensation. (R. at 438.) On March 25, 2010, Plaintiff stated that the pain in his right leg had improved following an L4-5 discectomy. (R. at 466.)

On June 22, 2010, Plaintiff explained to Dr. Graham that his pain improved initially following the discectomy, but had returned over the last several weeks. (R. at 578.) However, Plaintiff also stated that he failed to enroll in his prescribed physical therapy program because of scheduling difficulties. (R. at 578.) Further, Dr. Graham observed on examination that Plaintiff's reflexes were intact in both knees and diminished in his right Achilles. (R. at 578.) On July 20, 2010, Dr. Graham observed that Plaintiff's MRI showed that the prior disc herniation looked good and noted that Plaintiff had experienced improvement over the previous six weeks. (R. at 576.)

On November 23, 2010, Plaintiff's musculoskeletal examination showed that he retained normal range of motion and normal strength, had no tenderness, swelling or deformity and walked with a normal gait. (R. at 516.) Plaintiff's sensation and motor function were normal and he exhibited no focal deficits. (R. at 516.) On December 1, 2010, Plaintiff underwent surgery for laminectomies at L3, L4, and L5, posterior interbody arthrodesis at L3-4, L4-5 and L5-S1, pedicle screw instrumentation at L3, L4, L5 and S1, arthrodesis posterior lateral from L3 to S1 and durotomy repair. (R. at 549.) On January 11, 2011, Dr. Graham observed that Plaintiff's instrumentation remained intact and that his alignment looked good. (R. at 884.) Plaintiff stated that he experienced some residual pain, but expressed that he felt better. (R. at 884.)

On May 11, 2011, Dr. Green observed that Plaintiff's reflexes, motor strength and gait were normal and his sensation was intact. (R. at 638.) On May 24, 2011, Dr. Graham ordered and examined Plaintiff's x-rays that showed that the hardware remained intact, there were no halos around the screws and the fusion began to form. (R. at 568.) Further, Plaintiff's vertebral body heights were normal, no bony destructive lesions were evident and no interval change had occurred since Plaintiff's last examination. (R. at 870.) On May 25, 2011, Dr. Basavaraj's physical examination of Plaintiff's left leg showed normal range of motion in his hip, knee and ankle joints. (R. at 848.) Plaintiff retained 5/5 strength in all muscles tested and demonstrated normal knee and ankle jerk reflexes. (R. at 848.) Plaintiff's right leg examination showed that he had 5/5 strength in all muscles without atrophy. (R. at 848.) Dr. Basavaraj noted that Plaintiff's straight-leg raise test was normal on the left and that Plaintiff began to experience pain at ninety degrees on the right. (R. at 848.)

On October 18, 2011, Dr. Graham opined that Plaintiff's hardware remained intact and that the fusion had healed well. (R. at 867.) Dr. Graham also noted that Plaintiff retained good motor strength. (R. at 867.) In November 2011, Dr. Powell observed that Plaintiff could walk from the waiting room to the examining room without difficulty and could sit, get on and off of the examination table without assistance, could go from supine to sitting without any assistance and could take his own shoes on and off. (R. at 610.) Plaintiff walked with a normal gait and did not require any assistive devices. (R. at 611.) Plaintiff's straight-leg raise test results were negative and Plaintiff retained 5/5 motor strength in his arms and legs. (R. at 611.)

On January 24, 2012, Dr. Green observed that Plaintiff's gait remained normal, that he retained a full range of motion in his back and exhibited no tenderness, palpable spasm or pain on motion. (R. at 679-81.) In February 2012, Plaintiff demonstrated full range of motion and

30

presented negative for myalgias, arthralgias, back pain, muscle weakness, joint pain and gait problems. (R. at 704.) On August 31, 2012, Dr. Graham determined that Plaintiff's neurological examinations were stable, his motor strength and sensory examination remained normal and intact, and he ambulated without difficulty. (R. at 935.)

Plaintiff's own statements further support the ALJ's decision to diminish Plaintiff's credibility. Plaintiff stated that he did not need assistance using the toilet, bathing or shaving. (R. at 46-47, 307.) He needed no special reminders to take his medicine or care for his personal hygiene. (R. at 308.) Plaintiff made meals for himself, cleaned up after himself, washed dishes and emptied the trash. (R. at 47, 308.) Plaintiff went outside every day and used public transportation or rode in a car. (R. at 309.) Plaintiff went to the store to buy groceries. (R. at 309.) Plaintiff could pay the bills, count change, handle a savings account and use a checkbook or money order. (R. at 309.) He spent time with others about three to four times per week. (R. at 310.) Plaintiff did not need anyone to accompany him when he went out. (R. at 309-10.)

During his hearing, Plaintiff testified that he could lift approximately twenty pounds, but that doing so could strain his back. (R. at 49.) He further testified that he could sit for thirty to forty-five minutes before needing to stand up. (R. at 50.) Plaintiff acknowledged that sitting did not affect his ability to focus. (R. at 51.) He could stand for approximately fifteen minutes before he needed to sit down. (R. at 51.) Therefore, substantial evidence supports the ALJ's credibility determination.

D. The ALJ did not err in determining that Plaintiff had the ability to perform light work with additional limitations.

Plaintiff contends that the ALJ erred in finding that Plaintiff maintained the ability to perform light work with limitations. (Pl.'s Mem. at 14-16.) Specifically, Plaintiff attacks the ALJ's decision as arbitrary, capricious and an abuse of discretion. (Pl.'s Mem. at 14.)

31

Defendant responds that substantial evidence supports the ALJ's RFC determination. (Def.'s Mem. at 2.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, the ALJ must first assess the nature and extent of the claimant's physical limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 416.945(b). Generally, the claimant is responsible for providing the evidence that the ALJ utilizes in making his RFC determination; however, before determining that a claimant is not disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 416.945(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record, as well as those impairments that are based on the claimant's credible complaints. *Carter v. Astrue*, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011); *accord* 20 C.F.R. § 416.945(e).

After considering all of Plaintiff's physical and mental impairments, the ALJ found that Plaintiff had the RFC to perform light work with additional limitations. (R. at 17.) Specifically, the ALJ concluded that Plaintiff could lift ten pounds frequently and twenty pounds occasionally, sit for six hours, stand and walk for six hours, could not negotiate ladders, ropes or scaffolding, could occasionally crawl, crouch, bend and stoop, required a sit or stand in place option for two minutes twice each hour, needed to rest ten minutes every two hours, was limited to simple, routine tasks and needed to miss eight days of work each year. (R. at 17.)

Substantial evidence supports the ALJ's determination regarding Plaintiff's RFC on the basis of medical evidence. In January and November 2010, Plaintiff exhibited no motor or

sensory loss.  (R. at 410, 516.)  In October and November 2011, Plaintiff exhibited full motor

strength .  (R. at 611, 867.)  Between March 2010 and April 2013, doctors observed repeatedly

that Plaintiff walked with a normal gait.  (R. at 438, 516, 637, 679, 929, 946, 995.)  On March

25, 2010, Plaintiff stated that his right leg pain had improved following a microdiscectomy

surgery.  (R. at 466.)  On July 20, 2010, Dr. Graham observed that Plaintiff's prior disc

herniation looked good on the scan and noted that Plaintiff had experienced improvement during

the previous six weeks.  (R. at 576.)

On January 11, 2011, following Plaintiff's second surgery for his degenerative disc

disease, Dr. Graham opined that Plaintiff's lumbar x-rays showed that the instrumentation

remained intact and that Plaintiff's alignment looked good.  (R. at 884.)  Plaintiff also stated that

he felt better.  (R. at 884.)  On May 11, 2011, Plaintiff still complained of lower back pain, but

noted that standing, sitting, walking, walking uphill and running alleviated his pain.  (R. at 636.)

On May 24, 2011, Dr. Graham opined that Plaintiff's x-rays showed that his hardware remained

intact, that there were no halos around the screws and that the bony fusion had begun to form.

(R. at 568.)  Further, Plaintiff's vertebral body heights were normal, no bony destructive lesions

were evident and no interval change had occurred since Plaintiff's last examination.  (R. at 870.)

On August 31, 2012, Dr. Graham observed that Plaintiff's neurological examinations were

stable, he retained intact motor strength and sensation, and he ambulated without difficulty.  (R.

at 935.)  On November 15, 2011 and April 30, 2013, Dr. Powell observed that Plaintiff could

walk from the waiting room to the examining room without difficulty and could sit, get onto and

off of the examination table without assistance, could go from supine to sitting without

assistance and could put on and remove his shoes.  (R. at 610, 625.)

33

Plaintiff's own statements also support the ALJ's RFC determination. Plaintiff stated in his function report and testified at his hearing that he did not need assistance using the toilet or bathing and did not need reminders to take his medicine. (R. at 46-47, 307-08.) He reported that he made meals for himself and completed chores. (R. at 47, 308.) Plaintiff went outside every day without assistance and went to the store to buy groceries. (R. at 309.) He spent time with others approximately three to four times per week. (R. at 310.)

During his hearing, Plaintiff testified that he maintained the ability to lift approximately twenty pounds, sit for thirty to forty-five minutes continuously and could stand for approximately fifteen minutes before he needed to sit down. (R. at 49-51, 311.) Plaintiff further noted that sitting did not affect his ability to focus. (R. at 51.) Plaintiff reported that he followed written and oral instructions well and did not have trouble getting along with authority figures. (R. at 311-12.) Therefore, the ALJ addressed all limitations in Plaintiff's RFC and did not err in finding that Plaintiff maintained the ability to perform light work with limitations.

## VI.   CONCLUSION

For the reasons stated above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 11) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 13) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable Robert E. Payne and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of**

any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: February 13, 2015